## IN THE UNITED SATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION No.: 3:17-CV-01869-N |
| | § | |
| ALI SIDDIQUI AND | § | |
| JAYAPRAKASH | § | |
| SREENARASIMHAIAH, | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Plaintiff Jane Doe submits her Plaintiff's First Amended Complaint[1] complaining of and against Ali Siddiqui and Jayaprakash Sreenarasimhaiah(collectively hereinafter referred to as the "Defendants") and for cause, would respectfully show unto this Court as follows:

### PARTIES

1.  **Plaintiff Jane Doe ("Dr. Doe" or "Plaintiff")** is an individual who, at the time this suit was commenced, resided in Dallas, Dallas County, Texas.

2.  **Defendant Ali Siddiqui ("Dr. Siddiqui")** is an individual resident of the State of Pennsylvania who has appeared through his counsel of record in this suit.

3.  **Defendant Jayaprakash Sreenarasimhaiah ("Dr. Sree")** is an individual resident of the State of Texas resident who has appeared through his counsel of record in this suit.

---

[1] Timely Filed as of September 7, 2017, which is within 21 days of Dr. Sree's August 17, 2017 Motion to Dismiss

## FACTS

### DR. DOE'S BACKGROUND

4.     Dr. Doe was born in Jiangsu Province, China, to two traditional Chinese parents.  Seeking a better life, better opportunities, and freedom from oppression from those in positions of authority, when Dr. Doe was ten years old, her parents managed to leave China to permanently reside in the United States.

5.     Appreciative of all the United States offered and provided to them, Dr. Doe and her family became citizens of the United States and Dr. Doe toiled tirelessly to put herself in a position to give back to her adopted country by doing all she could to take advantage of the educational opportunities afforded to her in the United States to achieve her dream of becoming a doctor and serving her community.

6.     Thus, in 2002, Dr. Doe was accepted to and started her undergraduate education at the University of Texas at Austin.  Dr. Doe graduated from the University of Texas at Austin in 2006 with Honors and a Bachelor's of Sciences in Neurobiology.

7.     Having completed her undergraduate education, Dr. Doe then focused her efforts and her resources on medical school.  In 2010, Dr. Doe graduated from the Medical College of Wisconsin as an M.D. After receiving her M.D., Dr. Doe spent three more years at the Medical College of Wisconsin as an Internal Medicine Resident.

8.     After completing her residency in Wisconsin and prior to an upcoming fellowship at the University of Texas – Southwestern Medical Center in Dallas, Texas ("UT Southwestern"), Dr. Doe accepted a one month training rotation for Advanced Endoscopy at The Second Military Medical University (at Shanghai Hospital) in Shanghai, China.  Dr. Doe's experience in China was profound as it reaffirmed her love

for the freedoms she enjoyed in the United States, including the freedom from official and authoritative oppression so prevalent in other parts of the world, including China.

9.     Upon returning from China, Dr. Doe spent the next three years training as a Digestive and Liver Disease Fellow at UT Southwestern.

10.     As her life and her resume demonstrate, Dr. Doe is hard working, highly educated, highly motivated, and a proud person, dedicated to achieving her dream of helping others through the practice of medicine.    Being highly motivated to achieve her dream, and given her cultural background and early life experiences in China, Dr. Doe's drive and dream was and is her strength, but could also, in the wrong hands, be manipulated to be her weakness.  Defendants "groomed" Dr. Doe and manipulated her strengths into her weakness.

### THE INTRODUCTION
### MAY 2015 THROUGH JUNE 2015

11.     As part of the fulfillment of her dream, on May 17, 2015, while  doing her fellowship at UT Southwestern, Dr. Doe, traveled from Dallas to Washington D.C. to attend a national medical conference called Digestive Disease Week ("DDW").

12.     DDW is the premier medical conference for endoscopy and gastroenterology, and features, among other opportunities, a Poster Hall of about 4,300 posters where medical students, trainees, and doctors display their medical research. The Poster Hall is an important exercise for medical researchers such as Dr. Doe because it provides unique access to in-person industry networking, and gives participants the opportunity to ask questions and receive feedback on their research from peers and experts in their field, that they would not otherwise have access to. Attendance at DDW provides unique opportunities for the attendees as it provides

neophytes with exposure to the most respected doctors and researchers in their fields and the opportunity to form relationships and advance their research and careers.  Dr. Doe was in awe of the research and attendees at DDW and the possibilities presented to her for advancement of her work, her dream and her career.

13.     While showcasing her research at DDW, Dr. Doe was approached by a friend with an unknown man by his side.  The friend introduced Dr. Doe to the unknown man who introduced himself as Dr. Siddiqui.  Over the course of DDW, Dr. Siddiqui used his position and seized upon Dr. Doe's drive to groom her and, eventually, prey upon her.  Dr. Siddiqui told Dr. Doe that he was a physician, professor, and the Director of Endoscopic Research at Thomas Jefferson University Hospital ("TJUH") in Philadelphia.  Dr. Siddiqui also bragged to Dr. Doe that, he was an expert in Dr. Doe's field of study (Advanced Endoscopy: a specialty within Gastroenterology), that he was previously employed at UT Southwestern where she was performing her fellowship, that he had numerous connections at both TJUH and UT Southwestern, and that he directed many research projects and accordingly published a lot of work in her field.

14.     Dr. Siddiqui said everything he could say to leave an impressionable young professional in awe of him.  By the end of DDW, Dr. Siddiqui had offered Dr. Doe, among other things, the opportunity to work for him as a fellow and assist him in conducting research and co-authoring his publications.  In return for her contributions, Dr. Siddiqui said he would supervise and mentor Dr. Doe and open professional opportunities for her that she would not otherwise have without his endorsement.  This was exactly the kind of opportunity a young, aspiring, impressionable professional dreams of receiving and, as Dr. Siddiqui knew she would, Dr. Doe eagerly accepted his

offers.

15.     Although Dr. Doe was in Dallas and Dr. Siddiqui was in Philadelphia, Dr. Siddiqui immediately brought Dr. Doe on to assist on several of his research projects where he acted as her direct supervisor on the research projects.  By May 25, 2015, Dr. Siddiqui had already e-mailed Dr. Doe and asked for her assistance on a manuscript that he was writing in collaboration with Cornell University.  On May 27, 2015, Dr. Siddiqui asked for Dr. Doe's assistance writing the introduction and 'methods' section of a research project.  Dr. Doe was nothing short of ecstatic to have the opportunity to work with a distinguished mentor who had the apparent ability to enhance her work and advance her career.  As part of the grooming process, however, as Dr. Doe did more and more work for Dr. Siddiqui, the communications between the two became more and more frequent and more and more casual and flirtatious.

### The Relationship
### July 2015 Through October 2015

16.     On July 4, 2015, Dr. Siddiqui flew from Philadelphia to Dallas, ostensibly for his nephew's birthday.  When he arrived in Dallas, Dr. Siddiqui contacted Dr. Doe and suggested that she meet him for dinner and Dr. Doe agreed to go to dinner.  At dinner, Dr. Siddiqui continued to groom Dr. Doe and exert his authority over her to have achieve his goal of engaging in sexual relations with her.  During the course of the dinner, Dr. Doe made subtle, inappropriate comments and sexual innuendoes about Ms. Doe's clothes and her body.

17.     Thereafter, on or around July 17, 2015, Dr. Siddiqui returned to Dallas and again suggested that Dr. Doe join him for dinner.  Once again, Dr. Doe felt compelled to attend.  This time, however, Dr. Siddiqui's subtle comments were more brazen as he

bombarded her with sexual suggestions, innuendo, and overtures.   Moreover, at this dinner, Dr. Siddiqui pressured Doe, who does not drink, into drinking alcohol.   Having gotten her drunk, Dr. Siddiqui pounced and coerced Dr. Doe, who was a virgin, into having sex with him that night.   Ashamed, lost and "feeling guilty" about drinking and losing her virginity in the manner and to the person she had, Dr. Doe was left paralyzed and in fear that her work and her career were in turmoil.   Dr. Siddiqui had Dr. Doe right where he wanted her and where he planned all along.   The next time Dr. Doe and Dr. Siddiqui met in person was sometime in September 2015.   Dr. Siddiqui flew to Dallas to visit Dr. Doe and he again manipulated Dr. Doe into having sex with him; for the last time.

18.     In the following weeks, Dr. Doe came to the realization that Dr. Siddiqui's intentions were not to have a professional relationship with her as he had represented and promised when he lured her in, but were, instead, to have sex with her.   She decided that both her professional and personal relationship with Dr. Siddiqui needed to be terminated.   Dr. Doe, thought long and hard about how to approach Dr. Siddiqui about terminating their brief sexual relationship, as she did not want to hurt his feelings nor did she want to abandon her professional commitments.

19.     Thus, on October 28, 2015, Dr. Doe mustered up the courage to call the man who had gotten her drunk and taken her virginity, to forgo all the work she had done and expected to do, to forgo all the authorship attribution she was in line to receive, and over the telephone, she ended all personal and professional ties between herself and Dr. Siddiqui.   Following the lengthy telephone conversation between the parties, Dr. Siddiqui e-mailed Dr. Doe the following confirmation of Dr. Doe's intent,

except he added a caveat:

> "Hi. **I will not text or call you again if that is what you
> want. I promise you that.  But** I have put your name on 2
> research papers and the Esophageal stent suture abstract.  **I
> will need to communicate with you for these projects** at
> times.   Just please be kind and **respond to my emails
> when they are in regards to these research projects**."
> (**emphasis added**)

20.     At that time, Dr. Siddiqui lived in Pennsylvania and Dr. Doe lived in Dallas.

Dr. Doe was hopeful and was manipulated into believing that a strictly professional

relationship could be maintained.  Dr. Siddiqui assured Dr. Doe that he would not further

his sexual pursuit of her or otherwise contact Dr. Doe except in regards to the research

projects they were working on.   Dr. Siddiqui was successful in his ultimate plan of

continuing his predatory practices by manipulating Dr. Doe into agreeing to continue

with the research projects and collaborations with Dr. Siddiqui.  Up to this point, Dr. Doe

was a full-time physician-learner who worked tirelessly to meet the rigorous demands of

UT Southwestern's nationally renowned program.   In the little down time that she had

between her twelve hour shifts at work, she chose to research, write, and proofread

articles, chapters, and papers for Dr. Siddiqui.   Unfortunately, her dreams of getting

published turned into a nightmare.

### A Scorned Man
### November 2015 Through February 2016

21.     As time went by and despite his promises otherwise, Dr. Siddiqui

absolutely refused to keep his relationship with Dr. Doe professional despite repeated

oral and documented requests that he do so.

22.     By way of example, on January 1, 2016, Dr. Doe e-mailed Dr. Siddiqui a

lengthy paragraph solely related to a research project.  In the e-mail, Dr. Doe addressed

Dr. Siddiqui as 'Dr. Siddiqui' instead of addressing him by his first name or a nickname. Dr. Siddiqui, foreshadowing his inability to control his emotions, e-mailed Dr. Doe stating:

> "Hi. **Are things so bad between us that you now address me as Dr. Siddiqui. That really makes me sad. I don't want us to be like this**. I'll look at this tonight." (**emphasis added**)

23.     On January 13, 2016, for the first time, Dr. Doe became aware of Dr. Siddiqui's deviousness.   Dr. Siddiqui e-mailed Dr. Doe's co-author, Dr. David Lee, claiming that he was having a very hard time getting in touch with Dr. Doe and that Dr. Lee needed to contact Dr. Doe to ensure that she completed her work on time. Confused, Dr. Lee forwarded the e-mail to Dr. Doe.   When Dr. Doe confronted Dr. Siddiqui about his lies, all Dr. Siddiqui could focus on was that Dr. Doe again addressed him as 'Dr. Siddiqui' in her e-mail response.  On January 13, 2016, Dr. Siddiqui stated:

> "Hey. **Why do you have to keep on being like this** and **calling me Dr. Siddiqui**. It may be funny to you but **it's not fun for me**. It has been very hard for me and **you doing this makes it even more painful.**"

24.     Dr. Doe told Dr. Siddiqui, that it was frustrating for her that Dr. Siddiqui would make it appear to co-authors that she was not pulling her weight, and he replied:

> "I am sorry**. I never meant for it to sound like that. I know you are very busy** and **working hard. Please do not be frustrated**." (**emphasis added**)

25.     Allegedly feeling bad about the false statements he made to Dr. Lee, Dr. Siddiqui e-mailed Dr. Doe on January 16, 2016, the following:

> "I will work on the papers that you did. I know you probably don't need to hear this but **I am really feeling like crap still**. Maybe it will take my mind off stuff. Sorry **just needed to vent**..." (**emphasis added**)

26.     Not even a week later, Dr. Siddiqui upped the ante and prayed on Dr. Doe's goodness and emotions he had groomed since the day her met her at the DDW. Even though he had only been in Dr. Doe's physical presence ten to fifteen total days of his life, Dr. Siddiqui wrote to Dr. Doe that:

> "I can honestly say that the **last few weeks have been really awful for me** in a way that I could never have imagined. **I really miss you desperately**. I know **I really loved you** but **I underestimated how much you really meant to me**. Honestly, I would love for you to give me a chance. I know your mom has the issues against me. **I would really be willing to do anything if I could date you again**." (**emphasis added**)

27.     Dr. Siddiqui's email worked.  Having been manipulated into believing Dr. Siddiqui was in trouble, and in order to finalize her collaborations with him, Dr. Doe began calling Dr. Siddiqui by his first name again.  Unfortunately this manipulation was just one small step in Dr. Siddiqui's twisted scheme to pursue and control Dr. Doe.

28.     On February 18, 2016, Dr. Siddiqui texted to Dr. Doe statements that had been made by Dr. Siddiqui's friend, Defendant Dr. Sree.  Dr. Doe now knows that Dr. Dr. Siddiqui and Dr. Sree were more than just friends; they were collaborators and conspirators.  Dr. Sree worked with Dr. Doe at UT Southwestern and had been one of Dr. Doe's mentors and teachers.   Being in Dallas with Dr. Doe, and having the relationships and authority he had over Dr. Doe, Dr. Sree was an invaluable source of information about Dr. Doe, her activities, her pursuits and her career ambitions (collectively the "Doe Information"); all of which was essential information for Dr. Siddiqui to have and use if his torment and abuse of Dr. Doe was to continue.  Dr. Sree readily and unhesitatingly participated with Dr. Siddiqui by, among other things,

funneling the Doe Information to Dr. Siddiqui and enabling Dr. Siddiqui to continue to intrude into and torment Dr. Doe's life, career and relationships.

29.     The first hint of the collaboration between Dr. Siddiqui and Dr. Sree was revealed in Dr. Siddiqui's relay of Dr. Sree's statements in Dr. Siddiqui's February 18, 2016, text to Dr. Doe.  In the text, Dr. Siddiqui revealed that Dr. Sree and him were discussing and, it would later turn out, fixating on Dr. Doe, her life and her career.

30.     Dr. Siddiqui's text revealed that Dr. Sree and Dr. Siddiqui discussed Dr. Doe and her participation with Dr. Sree in a Cholangioscopy Chapter, DDW Poster, and Colonoscopy Paper.  Per Dr. Siddiqui, Dr. Sree stated, amongst other things: (1) How can [Dr. Doe] write anything meaningful?; (2) One of the abstracts she did with me on stones... I had to redo the whole thing. It was bad; (3) [Dr. Doe] needs a lot of help with endoscopy, not what I would consider advance endo[scopy] bound; (4) I did not realize [Dr. Doe] was poor in Endoscopy; and (5) Mayo (UT-SW faculty member) hates [Dr. Doe] and thinks [Dr. Doe has] attention deficit disorder.

31.     For Dr. Doe, it was alarming to hear that her co-worker and former mentor and teacher was not only talking behind her back but also talking negatively about her to Dr. Siddiqui.  Dr. Siddiqui knew that Dr. Doe worked with and knew Dr. Sree and accordingly, Dr. Doe became alarmed that Dr. Sree was talking about her to Dr. Siddiqui.  In the future, Dr. Siddiqui would use Dr. Sree's statements about Dr. Doe against her to further undermine her confidence in order to make Dr. Doe feel like she was inferior to her peers and to lead her to believe that her status at UT Southwestern was in jeopardy.

32.     After reading the text message from Dr. Siddiqui, Dr. Doe contacted her

phone company and had Dr. Siddiqui's phone numbers blocked from calling and text messaging her.  Unaware of the extent of Dr. Siddiqui and Dr. Sree's collaboration and Dr. Sree's ongoing communications with Dr. Siddiqui providing him with the Doe Information, Dr. Doe believed that without being able to contact her except via e-mail, Dr. Siddiqui's path to torment her would be greatly diminished.

33.    Dr. Siddiqui attempted to get Dr. Doe to unblock his phone number so that he could resume calling, texting and directly surveilling her.  In response, on February 19, 2016, Dr. Doe reiterated to Dr. Siddiqui that all communications should be limited to work-related matters and should only be discussed via e-mail.  Threatened with the loss of his ability to personally and directly surveill Dr. Doe, Dr. Siddiqui sought to pressure Dr. Doe into reopening direct, phone communications.  On February 20, 2016, Dr. Siddiqui wrote:

> "**It is very hard to discuss such stuff by email**. **I'm not sure what the issue here is?** I need to you make major changes to the paper as well.  They need major and significant edits. **It will take a very long detailed email for this. It's your choice however.** For all the help I have given you, **it's very sad to be treated like this**." (**emphasis added**)

34.    Then, on February 21, 2016, Dr. Siddiqui, who had presumably been stewing over not being able to speak with Dr. Doe via telephone, e-mailed her the following bullying tactic:

> "I don't know what is going on with you and your fellowship but I'd advice you. **You are really looked upon negatively by a lot of attendings there** [at UT Southwestern]. There is a perception that **you are disorganized, lazy and don't get along with the other fellows**. **And you are not far from probation if you score poorly** in the inservice. I'd just be careful." (**emphasis added**)

35.     Dr. Doe had had enough.   She was confused, scared, nervous, and horrified by Dr. Siddiqui's pressure, intimidation, and now bullying. Dr. Doe e-mailed Dr. Siddiqui the following:

> "I understand the book chapter is the last project that is not completed. [Dr. Lee] and I did the initial draft, but unfortunately, **at this point I don't feel comfortable to continue to work on this project**. **I appreciate the opportunity to have worked with you.** Thank you." (**emphasis added**)

36.     As would be expected from Dr. Siddiqui, he responded in kind on the same day.  He e-mailed Dr. Doe and stated the following:

> "I don't understand the issues here. You are the one who has finished it between us... Not me! **<u>I can't have you leave projects in the middle. It is very unfair to me. You promised to finish these projects. I just do not have the time.</u>** Why are you acting like this [?]" (**<u>emphasis added</u>**)

37.     At this point, Dr. Siddiqui had Dr. Doe right where he wanted her.   Dr. Doe was truly stuck between a rock and a hard place.   As a result, she had no choice but to continue to work with Dr. Siddiqui and be forced to interact with an emotionally manipulative superior who used his power and control over her to torment and abuse her.  Dr. Doe, an aspiring young doctor with her entire future ahead of her, was trapped.

### SIDDIQUI'S CONTROL OF DR. DOE

38.     On February, 18, 2016, Dr. Siddiqui e-mailed Dr. Doe and informed her that he had applied on her behalf, without her knowledge or consent, to a Program at TJUH, where he worked.  He even went as far to let Dr. Doe know that he filled out "five pages of paperwork for you for the nomination... I just didn't want you to be surprised and I am hopeful that you will get it."  Dr. Siddiqui even stated that his true intent in applying on her behalf was so they could spend every day together.

39.     As a result, on March 16, 2016, Gina Giannetti from TJUH e-mailed Dr.

Doe and provided her with an invitation to the Advanced Endoscopy Fellowship

Program at TJUH, *where Dr. Siddiqui was employed*.  On March 17, 2016, Dr. Siddiqui

e-mailed Dr. Doe the following:

> "We sent you an interview for the AEF. You are the only one
> who has not responded. Please do so. If you do not respond
> by Monday they will give the spot to someone else.
> Unfortunately, **apart from my letter, your letters are not
> the best.** I'm not sure how many AEF interviews you will get
> due to your letters. **I'll try to get you some more but some
> of the PDs that I talked about you to were put off a lot by
> your letters**. So please respond. I'm not sure why you never
> told me about your problems in your fellowship. **I'm just
> trying to help here**."

40.     In other words, Dr. Siddiqui was manipulating Dr. Doe into believing that

she was in trouble in her career without him, and that, she had to rely upon him to

ensure that she could become successful and reach her dream.

41.     Unbeknownst to Dr. Siddiqui, Dr. Doe e-mailed Mrs. Giannetti on March

18, 2016, thanking her for the opportunity to interview and politely declining.

42.     Prior to finding out that Dr. Doe had declined the interview that Dr.

Siddiqui had worked so hard to arrange for her, Dr. Siddiqui asked Dr. Doe to tell him

the other hospitals she wanted to attend and hospitals that had sent her interviews.  He

offered to personally talk to the hospitals to see if he could get her interviews and put in

a strong word for her.   Dr. Doe, desperate to rid herself of any connection to Dr.

Siddiqui, kindly responded to Dr. Siddiqui by thanking him for the offer, and informing

him that she believed her admission to any hospital should be based on her merit, not

Dr. Siddiqui.  Dr. Doe would later find out that, unable to get the information on his own,

Dr. Sree would later provide Dr. Siddiqui with Dr. Doe's prospective hospital "match"

lists as part of his facilitation and collaboration with Dr. Siddiqui.

43.     Unable to reestablish direct contact with Dr. Doe, on March 21, 2016, Dr. Siddiqui employed a new and insidious tactic.  In an effort to coerce Dr. Doe into speaking with him over the phone and unblock him, Dr. Siddiqui e-mailed Dr. Doe and falsely claimed that he was diagnosed with a rapidly progressive "MS" disease.  Once again, Dr. Doe declined to unblock Dr. Siddiqui.

44.     Later that day, Dr. Siddiqui learned that Dr. Doe refused the interview at TJUH.  When Dr. Siddiqui found out that Dr. Doe had refused the interview at TJUH, he simply upped the ante and, in an e-mailed, stated:

> "Seriously pushed a lot for you. **It's really egg on my face** that you refused to come to our place..."  (**emphasis added**)

45.     According to Dr. Siddiqui, none of Dr. Doe's successes were her own.  Dr. Siddiqui told Dr. Doe that he, without her knowledge or consent,  unilaterally spoke with high ranking TJUH admissions officers and *coerced* them into accepting Dr. Doe's application and granting her an interview.  Dr. Siddiqui claimed that TJUH does not normally accept very many women into their Program, and that Dr. Doe should consider herself, not just lucky, but a lottery winner for getting the interview.  She would be a fool not to take the chance.

46.     It did not set well with Dr. Siddiqui that Dr. Doe refused the interview he had applied for and arranged for her at TJUH.  Moreover, when Dr. Siddiqui found out on March 22, 2016, that Dr. Doe had also turned down a University of Pennsylvania interview that he had also taken it upon himself to arrange for her, he threatened that he was going to send Dr. Doe's father a topless picture of Dr. Doe that Dr. Doe never authorized, consented to being taken and never knew existed up until that point.  Dr.

Doe was sick to her stomach at the thought of her father seeing a naked picture of her.

47.     On March 23, 2016, in an effort to further insulate Dr. Doe from Dr. Siddiqui, Dr. Doe's father e-mailed Dr. Siddiqui Dr. Doe's assignments so that she could complete her work without being in contact with Dr. Siddiqui.  In response to receiving an e-mail from Dr. Doe's father, Dr. Siddiqui e-mailed Dr. Doe and refused to communicate with Dr. Doe through her father.  Dr. Siddiqui, feigning ignorance, claimed, among other things, that he was not aware of what he did to make Dr. Doe so uncomfortable and that he was never rude to Dr. Doe.  Again, Dr. Siddiqui reiterated his threat to e-mail Dr. Doe's father pictures that he had allegedly taken of Dr. Doe.

48.     Dr. Siddiqui continued his quest to wrest back control over Dr. Doe by pressuring Dr. Doe into completing work for him.  On March 23, 2016, despite sending e-mails the very same day threatening Dr. Doe, Dr. Siddiqui asked Dr. Doe to complete assignments for him.  Dr. Siddiqui wrote to her at 11:32 p.m., the following:

> "Can you please just work on this and give it to me in 2 weeks. **I think since you have placed it on your CV & you being the 1st author, it is your responsibility to complete it.** Please don't be stubborn and look at it rationally without being angry. **Are you deferring the book chapter as well?**" (**emphasis added**)

49.     On March 24, 2016, Dr. Siddiqui, again took out his frustrations on Dr. Doe.   He stated to her in an e-mail that she should not expect him to keep a professional relationship with her when he was "dumped like trash" and that Dr. Doe was brought up by her parents as "emotionally cold."

50.     Finally, on this same day, Dr. Siddiqui wrote twice more to Dr. Doe:

> "**I've lost the girl I loved, my health, and probably my job** this year. That should be revenge enough for you if you are

so angry at me. You don't realize I'm pretty sick. I've lost like 35 pounds already."

"I am really sorry about yesterday. I never meant to hurt you in that way. You just don't realize how much you hurt me. **Its not easy being in a relationship and then the other person says sorry I just want to be friends in such a nonchalant manner.** For the longest time after being dumped i thought you only dated me to get some papers for the AEF. I know thats not true but **I was so angry.  We all do stupid things when we are angry** and you know me well enough to know that this is not my nature. We both hurt each other and **I do not way you to hate me.** so please. i am sorry."

51.     May I reiterate, Dr. Doe and Dr. Siddiqui spent, at most, ten to fifteen total days in person together their entire lives.  Dr. Siddiqui's words evidenced an immature, erratic, and emotionally unstable human being, who had an unhealthy infatuation with Dr. Doe.

### The End of The Professional Relationship

52.     On February 29, 2016, Dr. Doe received a few random phone calls to her work pager.   That same day, Dr. Doe e-mailed Tonya Crews, an employee at UT Southwestern and requested a pager number change.  On March 15, 2016, Dr. Doe, again, began to receive random phone calls, however this time the calls were being sent to her personal cell phone.  Dr. Doe, again, e-mailed the applicable department and spoke with an employee named Cynthia Pahanish.  Mrs. Pahanish told Dr. Doe that she had already changed Dr. Doe's pager number as requested and that the only persons from the hospital who would have her cell phone number are the faculty at the hospital.  Mrs. Pahanish stated that the hospital faculty had to have her cell phone number for nights when she was on call.   Dr. Sree, Dr. Siddiqui's collaborator,

conspirator and facilitator, was among the faculty who had Dr. Doe's private information for those nights when she was on call.

53.    Unfortunately, with Dr. Sree's participation and collaboration with Dr. Siddiqui, UT Southwestern's efforts to facilitate Dr. Doe's efforts to build a wall around and insulate her from Dr. Siddiqui proved futile.   After Dr. Doe's Pager number was removed from the public Hospital Directory, Dr. Siddiqui attempted to coerce university operators into giving him Dr. Doe's Pager number, but the operators refused.  Thus, as a last resort, Dr. Siddiqui enlisted the help of his friend, Dr. Sree, to obtain Dr. Doe's private Pager number which was unavailable to the public and which could only have been accessed by someone with rights and access to the university system. Given Dr. Sree's access to the information, his obvious communications with Dr. Siddiqui, his relationship with Dr. Siddiqui and ongoing Doe Information being funneled to Dr. Siddiqui almost immediately upon Dr. Sree's receipt of same, Dr. Sree is reasonably presumed to be the person that provided Dr. Siddiqui with ongoing access to, and ability to torment, Dr. Doe.

54.    On March 23, 2016, Dr. Doe received two phone calls from unknown numbers.  On March 24, 2016, she received one phone call from the same unknown number.  And then, on March 26, 2016, on her university assigned work pager ("Pager") during work hours, Dr. Doe received *forty-one* prank pages to her Pager.  The forty-one pages included phone numbers and hospital codes, including but not limited to, the following: (1) Emergency Room "codes" (5 digit numbers that required immediate responses by Dr. Doe); (2) Doctors Phone Numbers that when returned by Dr. Doe, claimed they did not page her; (3) Fake Numbers which were not in service; and (4)

Patient Room Numbers who did not request Dr. Doe's assistance.

55.     The prank calls had become alarmingly distracting to Dr. Doe and imperiled the patients she was tending to.  It is important to note, like all practicing doctors on call at a hospital, Dr. Doe had to return every single page she gets on her Pager; a fact known by Dr. Siddiqui and Dr. Sree.  It is Dr. Doe's responsibility to the hospital and her patients to return every single phone call and page that she receives as the care of patients depends on it.  Thus, when Dr. Doe is examining a patient and gets a page from the Emergency Room, she has to stop what she is doing and call the Emergency Room.  When Dr. Doe receives a page that a patient needs assistance in their room, she has to stop what she is doing and go to the patient's room to assist.

56.     On March 26, 2016, and then on March 28, 2016, Dr. Doe filed her first and second police reports, detailing Dr. Siddiqui's harassment over the course of March 2016.

57.     At this point, Dr. Doe was finalizing her last project for Dr. Siddiqui.  Thus, on March, 29, 2016, Dr. Siddiqui made his final plea to Dr. Doe.  He e-mailed Dr. Doe, in part,  the following:

> "I am sorry that I wrote that email but you know my nature; **that was just written in a moment of anger.** I am sorry about what I wrote.  And I would never say anything to Mayo or Horton. Unfortunately**, I felt so hurt and wanted to get back at you** (which I am sorry for)...**I felt so hurt and betrayed** when you just without any regard to me just dumped me...  I just felt that you used [me] and I still feel like crap most days... **I wish that I could just be "professional" with you** ... but unlike you I cannot just switch emotions in a second. **I am sorry for all of this.** I still care about you more tha[n] you ever realized.  And no matter how much you may want to hurt me further at this time (since you are angry at me) I will tell you have cannot [fathom] how much hurt you have caused me... **you refusing to talk to me/blocking**

**me/ignoring me was so hurtful** and all that time I was totally civil to you, trying to help you. **Everyone has a breaking point and I reached mine that day.** And I never took advantage of you... please don't ever think that. I did love you unconditionally but unfortunately that was not good enough for you and your family."

58.     After receiving the previously quoted e-mail from Dr. Siddiqui, Dr. Doe responded in kind.  She said:

"We had a very productive research collaboration. I worked very hard for you and I always turned in research project to you in a timely manner. I do not appreciate you using the research collaboration as a method to communicate with me on personal matters and when I failed to reciprocate, you used deadlines, emails, telephones, pages to harass and threaten me. Over the past month, you sent me endless harassing telephone calls and pages that are fictitious. Answering these calls are time consuming and takes time from actual patient care. Have you thought about the consequences of missing pages for actual patient[s] due to this? We both are physicians, and these behaviors are frank harassment and are unprofessional...you have resorted to persistent harassment and intimidation... Again, like I said before, I have completed my collaboration with you. Please do not reply further."

59.     Dr. Siddiqui now realized that Dr. Doe would not willingly have a sexual relationship with him ever again and as a result he made it his goal to use his power, influence, and position at TJUH and UT Southwestern to continue to humiliate Dr. Doe, interfere with her career and her professional relationships, embarrass her, harass her, stalk her, terrorize her, and to intentionally cause her severe emotional distress.

### SIDDIQUI INTERFERES WITH WHAT HE CAN'T HAVE

60.     On March 31, 2016, Dr. Siddiqui sent an e-mail to all of the authors of an

article titled, "Endoscopic Ultrasound-Guided Pancreaticobiliary Intervention in Patients with Surgically Altered Anatomy and Inaccessible Papillae: A Review of Current Literature" ("Endoscopic Article").   Among the authors for the Endoscopic Article were Dr. Aaron Martin, Dr. Andy Kistler, Dr. Piotr Wrobel, and Dr. Doe.   Dr. Siddiqui instructed all of the authors to add the Endocopic Article to their Curriculum Vitae ("CV").

61.   On April 13, 2016, Dr. Siddiqui e-mailed Dr. Doe regarding two publications, Efficacy and Safety of Propofol-Mediated Sedation for Outpatient Endoscopic Retrograde Cholangiopancreatography ("ERCP Article") and Endoscopic Mucosal Resection of Large Nonampullary Duodenal Polyps: Technical Aspects and Long Term Therapeutic Outcomes ("Duodenal Article"), that she worked on with Dr. Siddiqui.   The ERCP Article had been approved by Dr. Siddiqui and submitted for publication by Dr. Siddiqui on September 24, 2015.   Dr. Doe was a co-author of the articles and was listed as such..

62.   Now, nearly seven months after the submission, Dr. Siddiqui falsely stated in an e-mail to the publisher that Dr. Doe did not directly work on either the ERCP Article or the Duodenal Article, and that he and his co-authors did not think that she merited recognition on the papers.   Dr. Siddiqui said his co-authors told him that Dr. Doe should be removed as an author on the articles.   Dr. Siddiqui then wrote to Dr. Doe that he would e-mail Dr. Todd Baron and Dr. Andrew Bries and that he would personally talk to Dr. Early at Washington University - St. Louis, with whom Dr. Doe was scheduled to interview, and tell them about the removal of her authorship attribution.   Dr. Siddiqui then wrote that it would be wise of Dr. Doe to inform all of the programs she was

interviewing with about the situation regarding her removal from the publications.

63.     It is important to note that Dr. Siddiqui e-mailed Dr. Doe with instructions for both the ERCP Article and the Duodenal Article.  After Dr. Doe reviewed the articles for Dr. Siddiqui, Dr. Siddiqui personally reviewed her work, Dr. Siddiqui finalized the authorship attribution for all authors, and Dr. Siddiqui personally reviewed Dr. Doe's CV with those articles included.  In other words, Dr. Doe had earned the right to be added as an author on the publications, but Dr. Siddiqui wrongfully had her removed.

64.     Dr. Siddiqui's e-mail sent Dr. Doe into a panic.  She had upcoming interviews, including ones with the specific doctors Dr. Siddiqui had mentioned in his email.  Dr. Doe was at a loss for words.  Dr. Doe was alarmed that Dr. Siddiqui was somehow gaining access to the Doe Information and utilizing that information in an ongoing effort to continue to torment her, manipulate her and interfere with her career, professional and personal life.  The only way Dr. Siddiqui could have obtained this information was from someone working with Dr. Siddiqui close enough and involved enough in Dr. Doe's professional life.  That someone is Dr. Sree.

65.     Almost one year had passed since she first met Dr. Siddiqui.  Dr. Siddiqui's emotional outbursts and refusal to remain professional alone created emotional and physical damages to Dr. Doe.  Now, Dr. Siddiqui was taking it upon himself to intentionally interfere with Dr. Doe's work, business, career and publications.

66.     On July 20, 2016, Dr. Doe received written notice from a project manager at Thieme Publishers named Nidhi Chopra.  The notice included Dr. Lee and Dr. Siddiqui.  In the notice, Ms. Chopra attempted to confirm, with Dr. Siddiqui, whether Dr. Doe should be added as a second author to a Cholangioscopy Chapter for a

Gastrointestinal Endoscopy Textbook.  As previously mentioned, Dr. Doe and Dr. Lee co-authored the chapter.  In fact, this was the article Dr. Siddiqui demanded that Dr. Doe finish and claimed he had no time to complete.   Dr. Doe, confused, e-mailed Dr. Lee.  Dr. Lee responded and admitted that he was confused as to the reason Dr. Doe had been removed from being listed as an author.  In fact, Dr. Lee e-mailed Dr. Doe and said:

> "I'm not sure why your name was moved from authorship to acknowledgements, given how extensively you were involved with this chapter. Definitely think this needs to get rectified back to give you authorship again."

67.    After reporting Dr. Siddiqui's action to UT Southwestern, Dr. Doe became caught between Dr. Siddiqui's sadistic games and the truth.  Dr. Siddiqui e-mailed Dr. Mayo at UT Southwestern and stated:

> "...before Dr. Doe goes on to make such accusations against us to other physicians, I would suggest that she have substantial documentation. The advanced endoscopy world is small and she has already earned a reputation that is not enviable."

68.    The back and forth between Dr. Siddiqui and Dr. Doe would continue from August 2016 through November 2016.  During this time, Dr. Doe continued to receive harassing pages and phone calls from blocked and unknown number.  It is impossible to explain just how frustrating Dr. Doe's life had become.  From February of 2016 through November 2016, Dr. Doe had changed her phone number numerous times, changed her Pager number numerous times, blocked Dr. Siddiqui from contacting her, requested UT Southwestern to take measures to seal her contact information (multiple requests and measures were taken), and still, some way, somehow, Dr. Siddiqui was

always one step ahead.  On November 7, 2016, Dr. Doe filed her third police report for harassment regarding the private unlisted calls on her cell phone and Pager.

### DR. SREE

69.    Dr. Doe, as mentioned earlier, worked and studied at UT Southwestern, located in Dallas, Texas.  Dr. Doe's time at UT Southwestern coincided with that of Dr. Sree.  Dr. Sree was, and still is, a faculty member at UT Southwestern and is the Director of the Advanced Endoscopy Fellowship.  Dr. Doe worked with Dr. Sree for three total years, including one year where Dr. Sree acted as her immediate supervising faculty member.

70.    Unbeknownst to Dr. Doe, Dr. Sree knew Dr. Siddiqui from the time they worked together at UT Southwestern.  Dr. Sree and Dr. Siddiqui were more than just colleagues, they were personal friends.  Unfortunately for Dr. Doe, Dr. Sree participated with Dr. Siddiqui and facilitated his continued onslaught, torment and interference by keeping tabs on Dr. Doe, and funneling the one, vital thing Dr. Siddiqui was being deprived of, the Doe Information.  Dr. Sree actively and willingly acted as the Trojan Horse in order to break through the barrier that Dr. Doe had erected between herself and Dr. Siddiqui.

71.    Upon information and belief, Dr. Sree first found out about the relationship between Dr. Siddiqui and Dr. Doe at or around the time Dr. Siddiqui and Dr. Sree attended a medical conference in Mississippi together.  At that time, as both men shared lodging together, Dr. Siddiqui confided in Dr. Sree about his feelings and betrayal that he felt toward one of Dr. Sree's former students, Dr. Doe.  In fact, the medical conference in Mississippi was around the same time that Dr. Siddiqui sent Dr.

Doe the degrading statements Dr. Sree was making about her.

72.     After the medical conference in Mississippi, Dr. Sree began to keep tabs on Dr. Doe.  And as time went by, it became apparent that he was aiding and abetting Dr. Siddiqui's actions.

73.     On March 10, 2016, Dr. Sree e-mailed Dr. Mayo and Dr. Mithani at UT Southwestern, his superiors, and requested that Dr. Siddiqui come and speak at a conference on endoscopic bariatric therapy, a field of study of Dr. Doe.  Dr. Sree knew about Dr. Siddiqui's predation upon and fascination with Dr. Doe, he knew that Dr. Doe was a student of Endoscopy, and he used his position at UT Southwestern to enable Dr. Siddiqui's harassment of Dr. Doe.   Instead of protecting his coworker and former student, Dr. Sree provided Dr. Siddiqui with the means to torment Dr. Doe.  Fortunately for Dr. Doe, Dr. Siddiqui in haste, e-mailed Dr. Doe that he was speaking at UT Southwestern, that he would see Dr. Doe in person, and then he forwarded her Dr. Sree's written request for him to do so.  Dr. Doe immediately contacted Dr. Mayo, who then denied Dr. Sree's request, knowing that Dr. Siddiqui was a danger to Dr. Doe.  Dr. Sree knew exactly why his request was denied and he knew exactly what he was doing. He was enabling Dr. Siddiqui.

74.     Dr. Sree often kept tabs on Dr. Doe for Dr. Siddiqui.  Because Dr. Doe was not aware of Dr. Sree's involvement with Dr. Siddiqui, she frequently confided in Dr. Sree and sought his advice on matters.   In many instances, soon after Dr. Doe communicated Doe Information to Dr. Sree, such information was immediately acquired by Dr. Siddiqui.  This included personal information on, among other things,  the men Dr. Doe was allegedly talking to, what hospitals she applied to, or what restaurants she

was eating at.   In order to find out how Dr. Siddiqui was receiving information from her personal life, Dr. Doe started asking coworkers and fellows whether Dr. Sree had been asking questions about her.   Then on March 22, 2016, Dr. Doe, in passing at work, told Dr. Sree that she was going to dinner at Hibiscus, a restaurant in Dallas.   The next day, March 23, 2016, Dr. Siddiqui sent an e-mail to Dr. Doe asking if she enjoyed her dinner at Hibiscus.   The only plausible explanation for Dr. Siddiqui knowing this information was if Dr. Sree, who knew Dr. Doe was going to the restaurant, told him.   Dr. Doe had found her source.

75.   On July 15, 2016, at 10:03 a.m., Dr. Sree sent Dr. Doe an e-mail which said, "I didn't know you took a spot out of the match. Congrats."   A "match" is defined as a hospital which medical professionals apply to and hope to receive the opportunity to work at.   In this instance, the "matches" were not made public until July 16, 2017.   That being said, not more than thirty three minutes after Dr. Sree texted Dr. Doe his congratulations, Dr. Siddiqui followed up with an e-mail at 10:36 a.m saying, "Dear Dr. Doe, these are you papers with me. Congratulations on your Hopkins AEF match."   Dr. Doe would later find out from multiple residents of UT Southwestern that Dr. Sree would go around to the doctors on call and ask questions relating to the schools Dr. Doe interviewed with and subsequently Dr. Doe's "matched" schools (which he later relayed to Dr. Siddiqui).

76.   On October 25, 2016, presumably using his actual phone number by accident, Dr. Sree called Dr. Doe at 5:00 a.m.   On November 2, 2016, again presumably using his actual phone number by accident, Dr. Sree called Dr. Doe at 2:39 a.m. and at 6:13 p.m.   When confronted with a screen shot from Dr. Doe's telephone,

Dr. Sree denied making the phone calls.

77.     Dr. Doe built a "Great Wall" around herself to prevent Dr. Siddiqui from reaching her.  Dr. Doe blocked Dr. Siddiqui from calling her, paging her, and texting her. However, due to Dr. Sree's assistance, Dr. Siddiqui was able to torment and harass Dr. Doe for over one year after they "broke up."

78.     Due to Dr. Siddiqui's multiple failed attempts to coerce UT Southwestern operators to provide him with Dr. Doe's sealed contact information, it is unfathomable that Dr. Siddiqui was able to gain access to Dr. Doe's sealed contact information without the assistance of Dr. Sree.

79.     Finally, Dr. Sree has admitted to at least one confidant that he provided Dr. Siddiqui with Dr. Doe's sealed contact information from UT Southwestern.  Mr. Louis Lara, Dr. Sree's friend located in Florida, who has since reached out to a family friend of Dr. Doe on behalf of Dr. Sree said as much.

### LEGAL REMEDIES

80.     At this point, it was clear to Dr. Doe that Dr. Siddiqui was never going to allow her to live a peaceful life.  Dr. Siddiqui, with the help of Dr. Sree, used their work together to pressure and influence Dr. Doe into staying in contact with him.  For over one year, Dr. Doe received phony and anonymous harassing phone calls and pages at all times of the day and night, whether at home or at work.  Her work was effected by the harassment and her personal well-being was effected.  Due to the threat of Dr. Siddiqui, Dr. Doe terminated her apartment lease early and moved back home with her parents.  Dr. Doe saw a therapist due to always having to look over her shoulder for Dr. Siddiqui and Dr. Sree.  Despite doing everything possible to block Dr. Siddiqui from

contacting her, Dr. Sree enabled Dr. Siddiqui's harassment.   Dr. Sree provided Dr. Siddiqui with contact information for Dr. Doe numerous times, even after her phone and Pager numbers were changed and sealed.   For months, Dr. Doe fought for her attribution rights on publications that she contributed to.   Dr. Doe currently lives in a constant state of fear and paranoia due to Dr. Siddiqui and Dr. Sree.

81.    Fed up with over one year of Dr. Siddiqui's torment, Dr. Doe met with an attorney to send Dr. Siddiqui a demand letter in hopes that it would scare him away. However, it did the total opposite.   Dr. Siddiqui continued his torment of Dr. Doe by creating e-mail addresses impersonating Dr. Doe and meant to confuse the recipient of the e-mail into thinking Dr. Doe sent the e-mails (something he had done to Dr. Doe in the past).   The e-mails ranged from admissions of not working on published work sent to publishers to hurtful comments about the recipient.

82.    After failing to stop Dr. Siddiqui with a demand letter, Dr. Doe had a demand letter send to TJUH.   TJUH launched an investigation into Dr. Doe's allegations and the investigation concluded with Dr. Siddiqui's resignation from TJUH.   No admissions or liabilities arose from TJUH's investigation and Dr. Siddiqui's subsequent resignation.   Dr. Siddiqui has proven that he is a threat to Dr. Doe.   Dr. Doe is now forced to bring this action to put a stop to Dr. Siddiqui and Dr. Sree's games.

## CAUSES OF ACTION

### INVASION OF PRIVACY - INTRUSION ON SECLUSION

83.     Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons as set forth in full.

84.     Dr. Siddiqui and Dr. Sree intentionally and willfully intruded on Plaintiff's solitude, seclusion, and private affairs.   Dr. Siddiqui and Dr. Sree, individually and collectively, accessed Plaintiff's personal information, identifiable information, and private information, and used said information to harass, stalk, and emotionally break down the Plaintiff.

85.     A reasonable person would find Dr. Pitafi and Dr. Sree's actions highly offensive.   Specifically, Medical Professionals have an upmost degree of care, responsibility, and duty to their profession, patients, and hospital, to uphold the standards set forth in their professional bylaws.

86.     Dr. Siddiqui and Dr. Sree used their positions of employment to gain access to secured information for the sole purpose of harassing and stalking Plaintiff. Specifically, Dr. Siddiqui accessed Dr. Doe's private information in order to falsify her identity on numerous applications for employment.   He also accessed Dr. Doe's sealed contact information in order to harass her using technology.

87.     Dr. Sree accessed Dr. Doe's sealed contact information and provided it to Dr. Siddiqui, Dr. Sree covertly gained information from Dr. Doe's coworkers, who were his subordinates, about Dr. Doe's personal life, and he relayed everything he learned to Dr. Siddiqui.

88.     Plaintiff has suffered damages which are ongoing and continuing.

89.     Plaintiff seeks damages within the jurisdictional limits of the Court.

**STALKING PURSUANT TO CIVIL PRACTICES & REMEDIES CODE § 85.003**

90.     Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons set forth in full.

91.     The conduct of Dr. Siddiqui and his conspirator, Dr. Sree, meet the requirements set forth in the Texas Civil Practices & Remedies Code § 85.003, the Texas Civil Stalking Law, for harassing behavior.

92.     The Texas Civil Stalking Law is applicable because Dr. Siddiqui, directly, and Dr. Sree, as a participant and Dr. Siddiqui's conspirator, in the following actions:

A. Dr. Siddiqui emotionally broke down and engaged in nonstop technological harassment, including but not limited to, threatening e-mails, fake telephone calls, fake pages, threats to send naked pictures of Plaintiff to her father on multiple occasions, threatened to appear at Plaintiff's apartment and work unannounced and uninvited caused Plaintiff to fear for her safety.

B. Dr. Siddiqui had the apparent ability to carry out the threats as he knew where she lived and where she worked.  Dr. Doe moved back home with her parents due to the fear instilled in her by Dr. Siddiqui.

C. Dr. Siddiqui's apparent ability to carry out the threat was the reason she terminated her lease to her apartment and moved home with her parents. It was also the reason she changed her phone number and Pager number on numerous occasions, and sealed her work contact information.

D. Plaintiff at least once, verbally, and at least once, in writing, clearly demanded that Dr. Siddiqui stop his harassing behavior;

E. After the demands to stop by Plaintiff, Dr. Siddiqui continued the harassing behavior; and

F. The harassing behavior has been reported to the police as a stalking offense.  As of this filing, four police reports have been filed against Dr. Siddiqui.

93.     Plaintiff seeks damages within the jurisdictional limits of the Court.

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

94.    Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons set forth in full.

95.    Plaintiff had a valid contract with multiple publishers and medical journals.

96.    Dr. Siddiqui and Dr. Sree willfully and intentionally interfered with the contracts between Plaintiff and those companies who published her work.

97.    The interference caused Plaintiff injury as she did not receive the proper attribution that she was entitled to receive for her work.

98.    The plaintiff incurred actual damages or loss in that she is being deprived of attribution and credit for work that she did.

99.    Plaintiff seeks damages within the jurisdictional limits of the Court.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS/RELATIONS

100.    Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons set forth in full.

101.    In Dr. Doe's field, publication of articles authored and/or co-authored by a doctor are noteworthy and result in substantial career, professional and reputational benefits for the authors, including job offers and other career opportunities.

102.    Dr. Doe co-authored and was supposed to get attribution on articles she wrote with Dr. Siddiqui.  As part of his ongoing torment and assault of Dr. Doe, and to manipulate and control her, Dr. Siddiqui lied to the publisher and defamed Dr. Doe to have her name removed as a co-author of the articles.  Dr. Siddiqui was successful in interfering with the publication of Dr. Doe as a co-author and the attribution of credit to her for her work on and contribution to the articles.  Dr. Siddiqui then exacerbated his

interference and the damage to Dr. Doe by calling at least one potential professional relationship and falsely stating that Dr. Doe was not a co-author of the article and that her name had been removed.  Dr. Siddiqui's conduct was independently tortious as he slandered the Plaintiff to prospective employers.

103.   The interference proximately caused the Plaintiff to lose prospective job opportunities, impaired Dr. Doe's reputation, interfered with Dr. Doe's professional relationships and diminished Dr. Doe's value in the marketplace, among other things..

104.   The Plaintiff suffered actual damage or loss by losing prospective job opportunities.

105.   Plaintiff seeks damages within the jurisdictional limits of the Court.

### Civil Conspiracy

106.   Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons set forth in full.

107.   Dr. Siddiqui and Dr. Sree are a combination of two or more persons.

108.   Dr. Siddiqui and Dr. Sree's object of their combination was to accomplish an unlawful purpose, which was to stalk, harass, embarrass, invade the privacy of, and tortuously interfere with present and future employment and employment opportunities.

109.   Dr. Siddiqui and Dr. Sree had a meeting of the minds on the course of actions they would take to harass, stalk, and terrorize Plaintiff.

110.   Dr. Siddiqui and Dr. Sree committed unlawful acts in furtherance of the course of action, as evidenced in the foregoing paragraphs.

111.   Plaintiff suffered injury as a proximate result of Dr. Siddiqui and Dr. Sree's unlawful acts.

112.   Plaintiff seeks damages within the jurisdictional limits of the Court.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

113.   Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons set forth in full.

114.   Plaintiff is seeking relief in her individual capacity.

115.   Dr. Siddiqui and Dr. Sree's conduct was intentional and reckless.

116.   Plaintiff's emotional distress was severe.

117.   Dr. Siddiqui and Dr. Sree conduct was extreme and outrageous.   Dr. Siddiqui and Dr. Sree's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.   Defendants' several acts considered together amount to extreme and outrageous conduct.

118.   Defendants' conduct was a proximate cause of Plaintiff's emotional distress.

119.   Plaintiff seeks damages within the jurisdictional limits of the Court.

### IDENTITY THEFT

120.   Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons as set forth in full.

121.   Dr. Siddiqui and Dr. Sree obtained, possessed, transferred, and used personal identifying information of Plaintiff without her consent to apply to employment positions and also to e-mail colleagues of Plaintiff's with the intent to identify as Plaintiff and with the intent to obtain a thing of value in the Plaintiff's name.

122.   Plaintiff seeks damages within the jurisdictional limits of the Court.

### AIDING AND ABETTING - ASSISTING AND ENCOURAGING AND/OR PARTICIPATING

123.    Plaintiff incorporates and re-alleges the foregoing paragraphs for all reasons as set forth in full.

124.    Dr. Sree committed by accessing the computer network at UT Southwestern and recording and transferring Plaintiff's sealed contact information to Dr. Siddiqui.

125.    Dr. Sree had knowledge that Dr. Siddiqui's conduct constituted a tort.

126.    Dr. Sree had the intent to assist Dr. Siddiqui in committing the tort.

127.    Dr. Sree gave Dr. Siddiqui assistance and/or encouragement.

128.    Dr. Sree's assistance and/or encouragement was a substantial factor in Dr. Siddiqui's tortious conduct..

129.    Plaintiff seeks damages within the jurisdictional limits of the Court.

### EXEMPLARY DAMAGES

Plaintiff re-alleges each and every paragraph as though they are set forth fully herein.

The acts of Defendants complained of herein were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice. In order to punish Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiff seeks recovery from Defendants of exemplary damages.

<u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED,** Jane Doe respectfully requests that citations be issued and process be served on Ali Siddiqui and Jayaprakash Sreenarasimhaiah; that upon final hearing, Plaintiff has and recovers judgment from and against Defendants for damages in the amounts proven at trial; exemplary damages; reasonable attorney's fees incurred by Plaintiff in prosecuting this action, for costs and expenses of suit herein, for pre-judgment and post-judgment interest on all monetary relief sought herein at the highest rates allowed by law; and, for such other and further relief to which Plaintiff may be justly entitled.

Respectfully Submitted,

*s/ Jason H. Friedman*

By: _____

**Lawrence J. Friedman**
State Bar No. 07469300
lfriedman@fflawoffice.com
**Jason H. Friedman**
State Bar No. 24059784
jhfriedman@fflawoffice.com
**Eric M. Friedman**
State Bar No. 24090106
efriedman@fflawoffice.com

**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned certifies that a true and correct copy of this is being served by the ECF system of notice, and via electronic mail on this the 7th day of September, 2017, in accordance with the Federal Rules of Civil Procedure.

Charles H. Wilson, Esq.
cwilson@cozen.com
Aaron Holt, Esq.
aholt@cozen.com
Cozen O'Connor, P.C.
1717 Main Street, Suite 3400
Dallas, Texas, 75201
Attorneys for Dr. Ali Siddiqui

Maryam Safari, Esq.
Maryam@henleylawpc.com
R. Lane Addison, Esq.
rladdison@henleylawpc.com
Henley & Henley, PC
2520 Fairmont St., Suite 200
Dallas, Texas, 75201
Attorneys for Dr. Ali Pitafi

Jeff Grass, Esq.
jeff@grasslaw.com
Law Offices of Jeffrey C. Grass
101 E Park Blvd, Suite 107
Plano, Texas, 75074
Attorney for Dr. Jayaprakash Sreenarasimhaiah

*s/ Jason H. Friedman*

By:_____